**21–CV–04543 (LDH)**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————

MADI GRANT,

*Petitioner,*

*- against -*

CHRISTOPHER MILLER,

*Respondent.*

RESPONDENT'S AFFIDAVIT AND MEMORANDUM OF LAW
IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

JOYCE A. SMITH
Acting District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3660
Jason.Richards@nassauda.org

Yael V. Levy
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

## TABLE OF CONTENTS

Page

Respondent's Affidavit In Opposition ........................................................................................ i-x

Respondent's Memorandum Of Law

    Table of Authorities ................................................................................................. i
    Introduction ..................................................................................................................1

    Statement Of Facts
      The Trial
        The People's Case .......................................................................................2
        The Petitioner's Case ................................................................................13
      The Verdict and Sentence ................................................................................13

    Argument

      Point I
        The Petitioner's Procedurally Defaulted Claim Of Legal
        Insufficiency Is Barred From Habeas Review, But Even If It Were
        Not, He Would Not Be Entitled To Relief Because The State Court's
        Adjudication Of The Claim Was Not Objectively Unreasonable ........................15

          A. The Petitioner Has Failed To Make The Exceptional
            Showing Of Cause And Prejudice That Would Allow Habeas
            Review Of His Procedurally Defaulted Claim ..........................................16

          B. It Was Not Objectively Unreasonable For The Appellate
            Division To Conclude That A Rational Juror, After Viewing
            The Evidence In The Light Most Favorable To The
            Prosecution, Could Have Found That The Petitioner Was The
            Driver Responsible For The Victim's Death ............................................19

      Point II
        The Petitioner's Claim That His Historical Cell Site Location
        Records Were Seized In Violation Of His Fourth Amendment
        Rights Is Barred From Habeas Review And, In Any Event, Is
        Meritless ................................................................................................................24

          A. The Petitioner Had An Opportunity For Full And Fair
            Litigation Of His Fourth Amendment Claim In State Court ....................24

          B. The Claim Was Rejected On Independent And Adequate
            State Procedural Grounds ........................................................................25

C.  In Any Event, The Claim Is Without Merit Because The Cell Site Records Were Acquired Only After A Judicial Finding Of Probable Cause ....................................................................27

Point III

The Petitioner's Attack On The Grand Jury Proceeding Is Baseless And Does Not Present A Federal Question Cognizable On Habeas Corpus Review...........................................................................31

Point IV

The Petitioner's Complaints About His Sentence Are Partially Moot And Do Not Present A Federal Question Cognizable On Habeas Corpus Review...........................................................................32

Conclusion .............................................................................35

Certificate of Service

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MADI GRANT,

          *Petitioner,*

   - *against* -

CHRISTOPHER MILLER,

         *Respondent.*

AFFIDAVIT IN OPPOSITION
TO PETITION FOR
WRIT OF HABEAS CORPUS

21-CV-04543 (LDH)

---

STATE OF NEW YORK     )
                ) ss.:
COUNTY OF NASSAU     )

JASON R. RICHARDS, being sworn, deposes and states as follows:

1.     I am an assistant district attorney, of counsel to the Honorable Joyce A. Smith, Acting District Attorney of the County of Nassau, and am admitted to practice before this Court.

2.     This affidavit is submitted pursuant to the order of this Court, dated August 19, 2021, directing the respondent to show cause why a writ of habeas corpus should not be issued.

3.     By agreement with the Office of the New York State Attorney General, the Nassau County District Attorney's Office ("District Attorney") is representing the respondent in this matter.

4.     Unless otherwise indicated, this affidavit is made upon information and belief, based upon the records and files of the District Attorney.

5.     At 6:30 a.m. on December 5, 2014, Sherman Richardson, an iron worker from Hempstead, New York, was driving east on the Southern State Parkway to his job site in Suffolk County. Unbeknownst to him, an SUV driven by the petitioner was rapidly approaching

i

Richardson's car from behind. The petitioner was heavily intoxicated and high on marijuana after a long night of partying at a gentleman's club in Queens. Without ever braking, the petitioner slammed into the back of Richardson's car, violently launching it into the woods bordering the parkway. When the Richardson's car hit a tree, the impact ruptured his heart and killed him instantly.

6.      The petitioner's passenger, Joseph Parks, was startled awake by the jolt of the collision. Parks looked over and saw the petitioner wrestling with the deployed airbag. Parks asked, "What did you hit?" The petitioner said, "I don't even know. I fell asleep." But the petitioner did not stop. He assured Parks, "Chill, I got somewhere to go." A motorist who had witnessed the fatal collision tried to get the petitioner to stop and followed him when he did not stop. The petitioner kept driving. He navigated the streets of Amityville, eluding his pursuer by running stop signs and traffic lights. The petitioner told Parks that he could not stop because he was drunk. He drove to a house in Copiague where Deborah Dubois, the mother of his children, resided.

7.      Leaving the damaged SUV outside Dubois's house, the petitioner and Parks went inside to sleep and sober up. Later that morning, Parks spoke to a friend on the phone and learned that someone had died in the collision. Parks told the petitioner and showed him reports on the local news. The petitioner decided to destroy the damaged car. He solicited the help of Parks and Dubois—along with two of her friends, Tamara Willis and Shamel Milner—to accomplish that task. At the petitioner's behest, Milner lit the damaged car on fire as it sat parked in front of Dubois's house.

8.      Throughout that day, and in the weeks and months that followed, the petitioner admitted to his friends that he had been drunk and behind the wheel during the fatal collision. He told a friend, Rajindra Rhamkharan, that he had driven drunk, and he discussed with Rhamkharan

ii

the steps he had taken to cover up the crime with the help of others. In addition, the petitioner made incriminating, if vague, statements to his girlfriend, Brittany Johnson. He admitted his guilt to Dubois, and he made more incriminating statements to Willis.

9.      Meanwhile, New York State Police investigators matched debris left at the collision site on the Southern State Parkway to the partially burned-out SUV—a rental—that was now in their custody. They confirmed that this was the vehicle that had slammed into Richardson's car and killed him. Investigators then traced possession of the SUV to Giovani Pisano, who had rented it. Pisano had then loaned the car to Parks, Pisano's friend and drug dealer. The trail from Pisano to Parks ultimately led police to the petitioner.

10.      At the end of a lengthy investigation, the police arrested the petitioner on September 22, 2015. Each of his co-conspirator friends gave the police a statement that incriminated the petitioner.

11.      Between December 10, 2014, and March 3, 2016, the New York State Supreme Court ("N.Y. Supreme Court"), issued a total of sixteen cell site location information orders, which targeted various telephone numbers associated with the subjects of the investigation of Sherman Richardson's death. Of the sixteen, two of the orders targeted telephone numbers belonging to the petitioner.

12.      The first order targeting a telephone number associated with the petitioner was issued by the court on July 7, 2015. In the application in support of the order, the prosecutor affirmed that:

- New York State Police Investigator Charles Fontanelli investigated the collision scene on the Southern State Parkway, and recovered the arson-damaged "subject vehicle" that had struck the victim's car;

iii

- Fontanelli determined that, prior to the collision, Giovanni Pisano had rented the subject vehicle and then loaned it to Joseph Parks;

- Fontanelli interviewed Parks, who stated that he was passenger in the vehicle when the collision occurred, and that the petitioner had been driving;

- After the fatal crash, the petitioner and Dubois, the mother of the petitioner's children, had arranged for a third person to light the vehicle on fire;

- The petitioner's phone number was (347) 553-9950.

13.     This information, the prosecutor affirmed, constituted "specific and articulable facts showing reasonable grounds, indeed probable cause, to believe that [cell site location records were] relevant and material to [the] ongoing investigation" of the hit-and-run collision and arson on December 5, 2014. The prosecutor further affirmed that "the application before [the court] has established probable cause to obtain the requested historical cell site location information connected to [the petitioner's telephone] for the time period of December 4, 2014, up to and including December 6, 2014."

14.     In its order, the court expressly stated that "there are specific and articulable facts showing reasonable grounds, indeed probable cause, to believe that information pertaining to telephone number 347-553-9950 . . . is relevant and material to an ongoing criminal investigation."

15.     The second cell site order targeting a telephone number associated with the petitioner was issued by the court on March 3, 2016. In the application in support of the order, the prosecutor affirmed the same facts contained in the July 7, 2015, application. The prosecutor further affirmed that:

- Fontanelli interviewed Milner, who admitted his involvement and stated that the petitioner had been contacting him and Dubois on their cellular phones throughout December 5, 2014;

iv

- The prosecutor interviewed Dubois, who also admitted her involvement and confirmed that she had communicated with the petitioner by cellular phone throughout December 5, 2014;

- Dubois stated that the petitioner was at her house from 6:40 to 9:00 a.m. on December 5, 2014, and during that time he received multiple phone calls from his girlfriend, Brittany Johnson;

- Phone records for Brittany Johnson revealed that the only calls made or received on her phone between 6:40 and 9:00 am on December 5, 2014, were to and from (917) 539-0672.

16. Using parallel language from the July 7, 2015, application and order, the prosecutor affirmed that the information contained in the affirmation established probable cause, and the court made an express probable cause finding in its order.

17. On March 3, 2017, at the conclusion of the petitioner's trial in N.Y. Supreme Court, he was found guilty of all eight counts presented to the jury: manslaughter in the second degree (N.Y. Penal Law ["Penal Law"] § 125.15); vehicular manslaughter in the second degree (Penal Law § 125.12); leaving the scene of an incident without reporting, as a felony (N.Y. Veh. & Traf. Law ["V.T.L."] § 600(2)(a)); operating a motor vehicle while under the influence of alcohol (V.T.L. § 1192(3)); operating a motor vehicle while impaired by the combined influence of drugs or of alcohol and any drug or drugs (V.T.L. § 1192(4-a)); aggravated unlicensed operation of a motor vehicle in the third degree (V.T.L. § 511(1)); arson in the third degree (Penal Law § 150.10(1)); and conspiracy in the fourth degree (Penal Law § 105.10(1)).

18. At his sentencing proceeding on August 11, 2017, following statements by members of Sherman Richardson's family, including his widow, the petitioner was sentenced to an aggregate term of imprisonment of fourteen to thirty years (McDonald, J.). The petitioner is currently incarcerated pursuant to the judgment of conviction.

19.     The petitioner's appointed appellate counsel filed a brief on the petitioner's behalf in the Appellate Division of the New York State Supreme Court, Second Judicial Department ("Appellate Division"), on or about July 5, 2018. In this sixty-one-page brief, counsel raised six claims: (1) the evidence of the petitioner's guilt was legally insufficient, and the jury's verdict was against the weight of the evidence; (2) the admission at trial of the petitioner's historical cell site location records violated his rights under the Fourth Amendment because the records were obtained without a proper search warrant; (3) a defective grand jury proceeding resulted in an indictment against the petitioner that did not confer jurisdiction on the trial court; (4) the sentencing court erred in ordering that the mandatory surcharge was to be collected by civil judgment; (5) the petitioner's aggregate term of imprisonment was unduly harsh and excessive; and (6) the restitution order was improper.

20.     On or about October 5, 2018, the District Attorney filed a brief in the Appellate Division seeking affirmance of the judgment of conviction. In her brief, the District Attorney argued that the evidence of the petitioner's guilt was overwhelming, that his Fourth Amendment rights were not violated because probable cause was demonstrated in the applications for his historical cell site location records, that the grand jury proceeding was not defective, and that the sentencing court acted properly in imposing the petitioner's sentence, which was not excessive.

21.     By order dated April 15, 2019, the Appellate Division denied the petitioner's motion for permission to file a *pro se* supplemental brief in support of his appeal.

22.     In a decision and order dated December 11, 2019, the Appellate Division modified the judgment of conviction by reducing the amount of restitution from $39,374.75 to $15,000.00 and by vacating the provision directing payment of the mandatory surcharge by civil judgment. As so modified, the judgment was affirmed. *People v. Grant*, 178 A.D.3d 850 (2d Dept. 2019).

23.     In response to a motion by the District Attorney to reargue the appeal, the Appellate Division, by decision and order dated July 1, 2020, granted the motion, recalled and vacated its decision and order dated December 11, 2019, and substituted for it one requiring the petitioner "to make restitution *to the Crime Victims Board for the family of Sherman Richardson in the sum of $15,000 and to Enterprise Rent–A–Car in the sum of $3,374.75." People v. Grant*, 185 A.D.3d 608, 608 (2d Dept. 2020) (emphasis in original). Aside from this change in the order, and additional language in the decision providing the legal basis for the change, the Appellate Division's decision and order of July 1, 2020, was identical to the one issued on December 11, 2019. The new order, like the former one, affirmed the judgment of conviction after reducing the total amount of restitution and vacating the provision directing payment of the mandatory surcharge by civil judgment. The only difference was the provision requiring restitution to the car rental company for the damage to the SUV that the petitioner had sought to destroy, in addition to the restitution—reduced to $15,000—to the family of the victim. *Id.*

24.     Regarding the petitioner's legal sufficiency claim, the Appellate Division ruled that the claim was "unpreserved for appellate review." *Grant*, 185 A.D.3d at 609. The court went on to hold that "[i]n any event" the evidence, viewed "in the light most favorable to the prosecution," was "legally sufficient to establish the [petitioner's] guilt beyond a reasonable doubt." *Id.* Likewise, the Appellate Division ruled that the petitioner's Fourth Amendment claim was both unpreserved and meritless. The lower court's order authorizing the acquisition of cell site location information was "effectively a warrant," the Appellate Division noted, because the order was based upon "an express finding of probable cause, which was supported by the People's evidentiary showing." *Id.* As such, the order did not violate the petitioner's Fourth Amendment rights as described in *Carpenter v. United States*, __ U.S. __, 138 S. Ct. 2206 (2018), the Appellate Division

held. *Grant*, 185 A.D.3d at 609. As to the petitioner's claims that the grand jury proceeding was defective and that his sentence was excessive, the Appellate Division held that the petitioner's "remaining contentions were without merit." *Id.* at 610.

26. On July 28, 2020, the New York Court of Appeals denied the petitioner's application for leave to appeal from the Appellate Division's affirmance of his judgment of conviction. *People v. Grant*, 35 N.Y.3d 1045 (2020). On the same date, the District Attorney's application for leave to appeal from the Appellate Division's modification of the restitution component of the petitioner's sentence was withdrawn. *Id.* The District Attorney's application had been rendered moot by the Appellate Division's decision and order of July 1, 2020.

26. On or about March 18, 2021, the petitioner filed a *pro se* motion in the N.Y. Supreme Court for an order waiving payment of the mandatory surcharge and other fees imposed at his sentencing. The motion was denied by order of the court dated April 16, 2021.

27. On August 2, 2021, the petitioner filed the instant *pro se* Petition for a Writ of Habeas Corpus ("Petition") in this Court. In the Petition, under "Ground One," the petitioner reprises the legal sufficiency claim he raised before the Appellate Division on direct appeal. Again, the petitioner contends that the prosecution failed to prove at trial that he was the driver of the SUV that collided with the victim's car (Petition at 4-5). Under "Ground Two," the petitioner again argues that his Fourth Amendment rights were violated because his historical cell site location data was not obtained by a proper search warrant (*id.* at 6). Under "Ground Three," the petitioner again contends that the grand jury proceeding was defective and should have resulted in the dismissal of the indictment against him (*id.* at 7). Under "Ground Four," the petitioner once more argues that the N.Y. Supreme Court should not have ordered that the mandatory surcharge would be collected by civil judgment, despite the Appellate Division's subsequent modification of this component of

viii

the petitioner's sentence (*id.* at 8). Under "Ground Five," the petitioner again complains that his sentence was excessive (*id.* at 8-9). Finally, under "Ground Six," the petitioner again contends that the restitution order was improper, despite the Appellate Division's subsequent modification of this component of the petitioner's sentence (*id.* at 10).

28.     The claims that the petitioner raises before this Court are unavailing. The majority of the claims are not cognizable in a federal habeas corpus proceeding, and some of those claims are moot, as well. The remaining claims are barred from review by independent and adequate state procedural grounds and are meritless in any event. The adjudication of the petitioner's claims by New York courts did not result in any decision that was contrary to, or involved an unreasonable application of, any Supreme Court precedent. Accordingly, there is no basis for this Court to grant any relief.

29.     In accordance with the Court's order, the respondent is providing the Court with copies of the following documents: (a) the respondent's affidavit and memorandum of law; (b) the transcripts of the trial and sentencing proceedings; (c) the petitioner's and the District Attorney's Appellate Division briefs on direct appeal; (d) the District Attorney's motion to the Appellate Division to reargue the appeal and the petitioner's opposition to the motion; (e) the decisions of the Appellate Division affirming the petitioner's judgment of conviction; (f) the petitioner's and the District Attorney's applications for leave to appeal to the N.Y. Court of Appeals and the papers filed in opposition; (g) the orders of the N.Y. Court of Appeals denying the petitioner leave to appeal and withdrawing the District Attorney's application for leave to appeal; and (h) the cell site order and application for each of the petitioner's telephone numbers.

30.     The petitioner is being provided with a copy of all unpublished decisions cited within this response.

WHEREFORE, and for the reasons set forth in the accompanying memorandum of law, the petitioner's application for a writ of habeas corpus should be denied.

/s/ Jason R. Richards
Jason R. Richards
Assistant District Attorney

Sworn to before me this
29th day of December, 2021.


/s/ Susan Beallias
SUSAN BEALLIAS
Notary Public, State of New York
No. 30-4728937
Qualified in Nassau County
Commission Expires April 30, 2022

x

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MADI GRANT,                                   21-CV-04543 (LDH)

       *Petitioner,*

  - *against* -


CHRISTOPHER MILLER,

       *Respondent.*

---


## RESPONDENT'S MEMORANDUM OF LAW


                 Respectfully submitted,

                 Joyce A. Smith
                 Acting District Attorney, Nassau County
                 *Attorney for Respondent*
                 262 Old Country Road
                 Mineola, New York 11501
                 (516) 571-3660


         By:       JASON R. RICHARDS
                 Assistant District Attorney


Yael V. Levy
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Arevalo v. Artus*,
104 F. Supp. 3d 257 (E.D.N.Y. 2015) ...................................................................................... 15

*Bailey v. Hill*,
599 F.3d 976 (9th Cir. 2010) ................................................................................................. 34

*Brinegar v. United States*,
338 U.S. 160 (1949) ............................................................................................................... 28

*Camara v. Municipal Court of City and County of San Francisco*,
387 U.S. 523(1967)................................................................................................................. 28

*Carmona v. U.S. Bureau of Prisons*,
243 F.3d 629 (2d Cir. 2001)..................................................................................... 18, 19, 27

*Carpenter v. United States*, __ U.S.,
__, 138 S. Ct. 2206 (2018)............................................................................................. passim

*Cavazos v. Smith*,
565 U.S. 1 (2011).................................................................................................................... 20

*Coleman v. Johnson*,
566 U.S. 650 (2012)................................................................................................................ 20

*Coleman v. Thompson*,
501 U.S. 722 (1991)................................................................................................................ 19

*Correa v. Duncan*,
172 F. Supp. 2d 378 (E.D.N.Y. 2001) ................................................................................... 15

*Cucuta v. New York City*,
25 F. Supp. 3d 400 (S.D.N.Y. 2014)...................................................................................... 26

*Davis v. Mantello*,
42 Fed. Appx. 488 (2d Cir. 2002)........................................................................................... 32

*Davis v. Nassau County*,
524 F. Supp. 2d 182 (E.D.N.Y. 2007) ................................................................................... 32

*Davis v. United States*,
564 U.S. 229 (2011).......................................................................................................... 29, 30

i

*Downs v. Lape*,
657 F.3d 97 (2d Cir. 2011)..................................................................................... 17, 26

*Dunlap v. Burge*,
583 F.3d 160 (2d Cir. 2009)........................................................................................ 16

*Einaugler v. Supreme Court of the State of N.Y.,*
109 F.3d 836 (2d Cir. 1997)........................................................................................ 20

*Garvey v. Duncan*,
485 F.3d 709 (2d Cir. 2007).................................................................................. 17, 18

*Gates v. Henderson*,
568 F.2d 830 (2d Cir. 1977)........................................................................................ 25

*Grey v. Hoke*,
933 F.2d 117 (2d Cir. 1991)........................................................................................ 25

*Harrington v. Richter*,
562 U.S. 86 (2011).................................................................................................... 20

*Harris v. Reed,*
489 U.S. 255 (1989).................................................................................................. 18

*Illinois v. Krull*,
480 U.S. 340 (1987).................................................................................................. 30

*Jackson v Virginia*,
443 U.S. 307 (1979)............................................................................................. 17, 20

*Kuhlmann v. Wilson*,
477 U.S. 436 (1986).................................................................................................. 25

*Lee v. Kemna*,
534 U.S. 362 (2002).................................................................................................. 18

*Lewis v. Jeffers,*
497 U.S. 764 (1990).................................................................................................. 15

*Lockyer v. Andrade*,
538 U.S. 63 (2003).................................................................................................... 19

*Lopez v. Riley,*
865 F.2d 30 (2d Cir.1989)......................................................................................... 32

ii

*Medina v. Gonyea*,
   111 F. Supp. 3d 225 (E.D.N.Y. 2015) .................................................................. 15, 18

*Obado v. New Jersey*,
   328 F.3d 716 (3d Cir. 2003)...................................................................................... 34

*Parker v. Matthews*,
   567 U.S. 37 (2012)..................................................................................................... 20

*People v. Clarke*,
   65 A.D.3d 1055 (2d Dept. 2009) ............................................................................ 16

*People v. Contes*,
   60 N.Y.2d 620 (1983) .......................................................................................... 16, 17

*People v. Delorbe*,
   35 N.Y.3d 112 (2020) ................................................................................................ 17

*People v. Grant*,
   185 A.D.3d 608 (2d Dept. 2020) ....................................................... 16, 17, 24, 25, 29

*People v. Hawkins*,
   11 N.Y.3d 484 (2008) ................................................................................................ 16

*People v. Lopez,*
   71 N.Y.2d 662 (1988) ................................................................................................ 17

*People v. Scott*,
   126 A.D.3d 645 (1st Dept. 2015)............................................................................. 26

*People v. Sorrentino*,
   93 A.D.3d 450 (1st Dept. 2012)............................................................................... 26

*Pina v. Kuhlmann,*
   239 F. Supp. 2d 285 (E.D.N.Y. 2003) ................................................................... 25

*Rattray v. Brown*,
   261 F. Supp. 2d 149 (E.D.N.Y. 2003) ................................................................... 18

*Schlup v. Delo*,
   513 U.S. 298 (1995)................................................................................................... 18

*Stone v. Powell*,
   428 U.S. 465 (1976)................................................................................................... 25

*Taylor v. Connelly*,
   18 F. Supp. 3d 242 (E.D.N.Y. 2014) ................................................................. 20

*Thiam v. Artuz*,
98 Civ. 6708 (MBM), 2000 WL 1056323 (S.D.N.Y. Aug. 1, 2000).......................................... 25

*United States v. Benbow*,
   709 Fed. Appx. 25 (U.S. Dist. Ct. D.C. 2018) ................................................... 31

*United States v. Felder*,
   993 F.3d 57 (2d Cir. 2021) ................................................................................ 30

*United States v. Gaggi*,
   811 F.2d 47 (2d Cir. 1987) ................................................................................ 34

*United States v. Mikhel*,
   889 F.3d 1003 (9th Cir. 2018) ..................................................................... 30, 31

*United States v. Nusraty*,
   867 F.2d 759 (2d Cir. 1989) .............................................................................. 20

*Velasquez v. Leonardo*,
   898 F.2d 7 (2d Cir. 1990) .................................................................................. 18

*Walker v. Walker*,
   259 F. Supp. 2d 221 (E.D.N.Y. 2003) ............................................................... 25

*Washington v. Smith*,
   564 F.3d 1350 (7th Cir. 2009) .......................................................................... 34

*Wasman v. United States*,
   468 U.S. 559 (1984)........................................................................................... 34

*White v. Keane*,
   969 F.2d 1381 (2d Cir. 1992)............................................................................. 34

*White v. Woodall*,
   572 U.S. 415 (2014).............................................................................. 19, 20, 24

*Williams v. Taylor*,
   529 U.S. 362 (2000)........................................................................................... 19

*Williams v. Taylor*,
   529 U.S. 420 (2000)........................................................................................... 18

**Statutes**

18 U.S.C. § 2703(d) ...................................................................................................... passim

28 U.S.C. § 2254 .................................................................................................. 16, 19, 27, 34

C.P.L. § 290.10(1) .......................................................................................................... 16

C.P.L. § 470.05 .......................................................................................................... passim

C.P.L. § 470.15 .......................................................................................................... 15

C.P.L. § 710(10) .......................................................................................................... 25

Penal Law § 60.27(5)(a) .......................................................................................... 33

Penal Law § 60.35(5) .......................................................................................... 33

Penal Law § 70.25(2) .......................................................................................... 34

Penal Law § 105.10(1) .......................................................................................... 14

Penal Law § 125.12 .......................................................................................... 14

Penal Law § 125.15 .......................................................................................... 13

Penal Law § 150.10(1) .......................................................................................... 14

V.T.L. § 511(1) .......................................................................................... 14

V.T.L. § 600(2)(a) .......................................................................................... 14

V.T.L. § 1192(3) .......................................................................................... 14

V.T.L. § 1192(4-a) .......................................................................................... 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MADI GRANT,                                          21-CV-04543 (LDH)

       *Petitioner,*

    *- against -*

CHRISTOPHER MILLER,

       *Respondent.*

INTRODUCTION

On the morning of December 5, 2014, the petitioner crashed a rented SUV into the back of a car on the Southern State Parkway, killing the driver of that car, Sherman Richardson. The petitioner was drunk and had been smoking marijuana. He fled the scene of the collision and then sought to destroy the evidence of his crimes by setting fire to the SUV. Debris from the collision, the eyewitness testimony of the passenger of the SUV, the petitioner's own admissions of guilt to his friends, and other evidence, including phone records, linked the petitioner to the collision and subsequent events and resulted in his conviction of manslaughter, arson, and other charges.

On appeal to the Appellate Division, the petitioner claimed: (1) the evidence of his guilt was legally insufficient, and the jury's verdict was against the weight of the evidence; (2) the admission at trial of the petitioner's historical cell site location records violated his rights under the Fourth Amendment because the records were obtained without a proper search warrant; (3) a defective grand jury proceeding resulted in an indictment against the petitioner that did not confer

1

jurisdiction on the trial court; (4) the sentencing court erred in ordering that the mandatory surcharge was to be collected by civil judgment; (5) the petitioner's aggregate term of imprisonment was unduly harsh and excessive; and (6) the restitution order was improper. The Appellate Division was unpersuaded by the petitioner's arguments, except insofar as the court reduced the amount of restitution to be paid by the petitioner and held that the sentencing court should not have ordered the collection of the mandatory surcharge by civil judgment. After modifying the sentence accordingly, a unanimous panel of the court affirmed his judgment of conviction as so modified.

Now, in his application for federal habeas corpus relief, the petitioner reprises the foregoing claims. The majority of the claims are not cognizable in a federal habeas corpus proceeding, and some of those claims are moot. The remaining claims are barred from review by independent and adequate state procedural grounds and are meritless in any event. For the foregoing reasons and those set forth in the "Argument" section below (pp. 19-41, *infra*), the Petition should be denied.

STATEMENT OF FACTS

The Trial

The People's Case

On December 4, 2014, the day before the fatal hit-and-run collision, the petitioner Madi Grant spent part of his day shuttling his girlfriend, BRITTANY JOHNSON, between her two jobs. At around 11:00 p.m., he picked up Johnson after her shift ended and took her to their residence in Uniondale. Then he left, stating that he and a friend were going to a bar (Johnson: T628-49).[1]

The petitioner went to a bar to meet his friend JOSEPH PARKS, a drug dealer. Earlier that day, Parks had borrowed a gray SUV, a rental car, from Giovanni Pisano, his friend and one of his

---

[1] Numbers preceded by"T" refer to the minutes of the petitioner's trial.

2

drug customers. That night, Parks went for drinks at Classico's in Uniondale, arriving sometime between 11:30 p.m. and 12:00 a.m. The petitioner met Parks at Classico's about twenty minutes after Parks's arrival there. Parks had two cocktails, and the petitioner drank two glasses of brandy and two beers. They left Classico's after about an hour. Parks planned to meet a woman at a gentleman's club in Queens, and the petitioner asked to come along (Parks: T850-61, 981-82, 993-94, 999-1001, 1049).

Using the SUV he had borrowed from Pisano, Parks drove to Starlet's Gentlemen's Club in Astoria, Queens. He and the petitioner drank brandy and smoked marijuana as they drove. They arrived around 1:30 a.m. In the club, they finished most of a bottle of brandy. The petitioner drank his brandy straight. The club closed at 4:30 a.m., and Parks and the petitioner took what remained in their brandy bottle and drinking glasses with them as they left (Parks: T861-67, 1063-65, 1137-38).

By this time, the petitioner was drunk, "laughing . . . [and] joking around more than usual" (Parks: T867-69). As they walked to the car, the petitioner asked Parks to let him drive. Parks said that they were both drunk, and that they could sit in the car and "sober up a little" first. But the petitioner dismissed that idea, telling Parks, "[I've] got it" (Parks: T870, 1124). Parks gave the petitioner the keys. Before setting out, they picked up a cigar from a gas station and used it to roll a marijuana "blunt." With brandy drinks in the cupholders and the bottle under Parks's seat, the pair smoked marijuana for about twenty minutes. Then the petitioner, whose license to drive was suspended and revoked (DMV Manager DONNA WEISSBARD: T1473-87), drove onto the highway and headed east as Parks fell asleep in the passenger seat (Parks: T870-74, 983, 1101, 1124).

3

Meanwhile, Sherman Richardson was at home preparing to go to work. He was an iron worker and member of the Metal Lathers Reinforcement local union. That day, he was assigned to a job site in Suffolk County. He left home at around 6:00 a.m. and drove east on the Southern State Parkway (JAWANA RICHARDSON [wife]: T474-76).

At around 6:30 a.m., OMARI SHAND and PHILIPPE DAVIS were also driving in the eastbound lanes on the Southern State Parkway (Shand: T500, 524; Davis: T803). As they approached Exit 32, a gray SUV came up quickly from behind. Both Shand and Davis saw the SUV drift from the left to the right lane as it passed. The SUV then smashed into the back of Sherman Richardson's black sedan in the right lane. The impact sent Richardson's car flying off the roadway into the woods. It slammed into a tree and flipped. The SUV, with the petitioner behind the wheel, did not stop. It sped on (Parks: T875; Shand: T500-04, 513-16, 524-28, 536-37; Davis: T803-06).

Richardson's injuries were fatal. The severe blunt force trauma caused by his car's collision with the tree completely transected his aorta and ruptured his heart (Nassau County Medical Examiner's Office Forensic Pathologist Dr. BRIAN O'REILLY: T1420-24).

In the gray SUV, Parks was jolted awake by the impact and loud sound of the crash. He saw dust all over the inside of the car. The petitioner, in the driver's seat, was moving the deployed airbag out of his way. Parks asked, "What did you hit?" The petitioner answered, "I don't even know. I fell asleep." But the petitioner did not stop; he continued down the parkway towards the exit, traveling at a speed of approximately sixty-five to seventy miles per hour (Parks: T874-77, 983-84, 1107-08, 1139; Shand: T504; Davis: T806).

Shand pursued, flashing his lights and honking his horn to get the petitioner's attention. The petitioner left the parkway at Exit 32 and got onto Route 110. He then turned onto side streets

4

(Parks: T878; Shand: T503-08, 514-21, 536-37). During the chase, the petitioner drove at high speeds while running stop signs and traffic lights (Parks: T879-80; Shand: T507-08). Parks asked the petitioner why he was not stopping. The petitioner responded that he could not stop because he was drunk (Parks: T877, 898). Shand finally lost sight of the gray SUV as the petitioner turned onto Carrol Street (Shand: T509, 537-38).

CATHERINE CHIANG, the first paramedic to arrive at the scene, saw that Richardson's car was heavily damaged (Chiang: T477-86). Richardson, in the driver's seat, was entrapped and had no pulse. Chiang pronounced him dead at 7:00 a.m. (Chiang: T481-86).

At around that time, New York State Police Investigator CHARLES FONTANELLI arrived at the scene (Fontanelli: T723-28). New York State Police Investigator KENNETH GEIN, a certified collision reconstructionist and instructor, arrived shortly after Fontanelli (Gein: T1364). Among the evidence scattered on the roadway, the investigators found a broken molding piece and paint chips from the gray SUV (Fontanelli: T728-31). Fontanelli obtained descriptions of the SUV and a partial license plate number from Shand and Davis (Fontanelli: T728-29, 732, 777-78). Meanwhile, Gein set up his equipment and made detailed recordings of the crime scene (Gein: T1364-89).

At approximately 6:45 a.m., shortly before the arrival of the police at the scene of the collision, the petitioner and Parks had arrived at 119 44th Street in Copiague, the home of DEBORAH DUBOIS (Parks: T880, 1109; Dubois: T1161-64). The petitioner and Dubois were in an "on and off relationship" and had three children together (Dubois: T1160-63). After wiping down the inside of the SUV, the petitioner knocked on Dubois's door (Parks: T881-82; Dubois: T1164). The petitioner appeared to Dubois to have had a "rough night," and he smelled of alcohol (Dubois: T1165). After the petitioner and Parks fell asleep on the sofa, Dubois used the petitioner's

5

phone to exchange angry text messages with Brittany Johnson (Johnson: T650-51, 719-21; Dubois: T1167). Later that morning, Dubois argued with the petitioner about his relationship with Johnson (Dubois: T1167-68).

As the petitioner and Dubois argued, Parks stepped outside and called Pisano, but he did not answer. Parks saw that the hazard lights on the SUV were still flashing (Parks: T884-85). ANNA MARIA LOAIZA, who lived across the street from Dubois, had seen the SUV with flashing lights in front of her house, and she placed a note on the car asking its owner not to park there (Loaiza: T559-62, 566-70; Parks: T885-86).

Around that time, Parks received a phone call from his friend Hugh Jennings. Parks told Jennings what had happened that morning, and Jennings alerted him to reports from Channel 12 News that the collision on the Southern State Parkway had caused a fatality (Parks: T886, 897, 1140). Parks went back inside the house and showed the news reports to the petitioner (Parks: T897-89, 1077, 1125-26; Dubois: T1169-70, 1209, 1225). Having seen the video clip from Channel 12 News, the petitioner said, "There was an accident. I fell asleep. It was an accident. I'm never going to see my family again. I'm going to go away forever. I'm never going to see my kids again" (Dubois: T1170). The petitioner lay on the floor for about a minute, and then got up and said, "I got to get the fuck out of here" (Parks: T898; Dubois: T1170).

Parks retrieved his laundry from the passenger side of the SUV while the petitioner retrieved items from the driver's side and wiped down the interior again. As they walked away, the petitioner threw the keys to the SUV down the sewer. The petitioner and Parks then walked to the nearby home of Gilbert Henry, the petitioner's brother (Parks: T898-900, 1147; Dubois: 1170-73, 1209-10, 1226-27). Henry drove them to Hempstead, where they met with Jennings, who drove the petitioner and Parks to Pisano's house in Hempstead (Parks: T900-03, 1080). At Pisano's

6

house, the petitioner discussed his options, including repairing the damaged SUV, reporting it stolen, or setting it on fire. He eventually decided to set the SUV on fire (Parks: T906-07).

While the petitioner was in Hempstead, Dubois asked TAMARA WILLIS, her best friend, to pick her up (Dubois: 1173, 1212; Willis: T1308, 1311-12, 1333). Dubois told Willis that the petitioner had killed someone on the parkway and that she was scared (Dubois: T1174-75; Willis: 1312-13). The petitioner called Dubois from Hempstead and asked her to help him get in touch with SHAMEL MILNER, Dubois's close family friend (Parks: T909; Dubois: T1176-77, 1218, 1233; Milner: T1266, 1294; Willis: T1316). Dubois and Willis picked up Milner, who received further instructions from the petitioner over the phone (Dubois: T1178-81; Milner: 1267-68, 1294-95; Willis: T1316-17). First, the petitioner instructed Milner to retrieve Pisano's wallet from the SUV, which Milner did (Milner: T1269-72, 1296). When he opened the door to the SUV, Milner saw that the airbag was deployed and that liquids had spilled all over the interior (Milner: T1272).

The petitioner called again, now telling Milner that he would pay him to burn the car (Dubois: T1177, 1218, 1233; Milner: T1273, 1297). Milner bought lighter fluid. Willis dropped him off near Dubois's house, giving him matches (Milner: T1273-77, 1299; Willis: T1318-19). But the lighter fluid did not start a fire in the SUV; it only filled the interior with smoke (Parks: T912-18, 1086; Milner: T1278-79, 1300; Willis: T1319-20).

After Jennings drove the petitioner and Parks back to Copaigue, Dubois, Milner, and Willis met with the petitioner in a parking lot (Parks: T910-11; Dubois: T1181-82; Milner: T1279-80; Willis: T1321-22). There, the petitioner told Milner to return and finish burning the car, and that the petitioner had $100 for Milner and would pay him another $400 after the SUV had been torched (Milner: T1281-82, 1300-02). The petitioner told Milner to use gasoline (Milner: T1282, 1300). Milner put the $100 from the petitioner in his pocket (Milner: T1282).

7

As the petitioner and Milner discussed plans to burn the car, Dubois asked Parks what had happened. When Parks answered, Dubois turned to the petitioner and asked, "Is that true?" The petitioner responded, "I fell asleep. It was an accident" (Dubois: 1183-84).

After that, Willis drove Milner to buy a cup and gasoline (Dubois: T1184-85; Milner: T1283-84; Willis: T1322-24, 1338). At around 3:00 p.m., Parks and Jennings returned to Hempstead (Parks: T918). At around that same time, Dubois left the group and went back to her house because her children were coming home from school (Dubois: 1185-86, 1222; Milner: T1285; Willis: T1324, 1339). Willis again let Milner out of her car near Dubois's house (Milner: T1285; Willis: T1324-25).

This time, Milner poured gasoline on the passenger side of the interior. When he lit the matches and threw them inside, flames shot out so powerfully that he was pushed back and could not close the passenger door (Milner: T1286-87, 1301; Willis: T1324-25). From inside her home, Dubois heard a loud boom. She ran outside and saw that the SUV was on fire (Dubois: T1186-87). Willis took Milner to buy a change of clothes and then dropped him off (Milner: T1288; Willis: T1325-26).

At around 4:30 p.m., Investigators Fontanelli and Gein were notified by Detective Sergeant Fitzpatrick of the Suffolk County Police Arson Unit that a gray SUV matching the description of the suspect's vehicle had been found burning on 44th Street in the Amityville/Copaigue area (North Amityville Fire Chief AARON COLLINS: T540-58; Fontanelli: T738-39; Gein: T1389-90). Fontanelli and Gein rushed to the scene of the fire and saw a gray 2013 Chevrolet Captiva SUV, bearing license plate number GHJ 5581, with front-end damage consistent with a collision. The entire passenger compartment had been destroyed by the fire (Collins: T542-44, 543-49;

8

Fontanelli: T739; Gein: T1390). Gein observed paint chips, paint transfer, and contact damage on the front of the SUV (Gein: T1391-94).

Later that day, the petitioner called Dubois and asked if the SUV had been "torched," and whether the police had come to the house (Dubois: T1188). The petitioner also called Parks and told him that the car had been burned (Parks: T919). Dubois contacted Willis and texted her photos of the burning SUV (Willis: T1326). Three or four days later, Milner spoke to the petitioner at Dubois's house. Milner asked the petitioner when he was going to pay him the $400 that the petitioner had promised, and the petitioner answered, "Don't worry, I got you" (Milner: T1291).

Around 7:00 or 8:00 p.m. on December 5, 2014, Willis went to Dubois's house and saw the petitioner there. He told Willis that he had been out the previous night at a club where he had spent a lot of money. The petitioner also said that he had been drunk and high. He felt "nice" when he left the club and admitted that he had been driving. But then he "must have blacked out" and "he felt like he bumped something, and that woke him up." He "thought he rolled over something, but his boy [Parks] was sitting next to him, and [Parks] was like, yo, bro, you just ran over something." The petitioner answered, "I didn't fucking run into anything," and he kept going (Willis: T1327-28).

Throughout December 5, 2014, the petitioner would not tell his girlfriend, Brittany Johnson, where he was, explaining, "I don't want to get you involved" (Johnson: T651-59). The following day, the petitioner admitted, "I got really, you know, drunk the other night," and said he would never drink again. He told Johnson that "he went out with his friend. They went to a bar, and, you know, there could have been a possibility that, you know, something could have happened" (Johnson: 661-62). The petitioner also stated, "I can go away for a really long time. I need to lay low for a little bit" (Johnson: T707).

9

On December 6, 2014, the petitioner called Parks. The petitioner stated that he had spoken to a lawyer and that they should simply deny having been at the crime scene. Several days later, the petitioner called to inform Parks that he had changed his phone numbers. After that, Parks did not hear from the petitioner again (Parks: T921-22).

Investigator Gein inspected the gray SUV at the State Police impound lot on December 8, 2014 (Gein: T1394-98, 1425-30). He matched the broken molding piece recovered from the Southern State Parkway with the damaged grill molding of the SUV (Gein: T1394-98). Gein saw that the passenger seat frame was in a reclined position. He accessed and downloaded the vehicle's event data recorder (Gein: T1398-1406, 1428-31).

Based on information from the event data recorder, Gein concluded that only one dynamic event had been recorded (Gein: T1434-37, 1463-64). The data showed that the front passenger seat had been occupied, and that the passenger was wearing a seatbelt, but that the driver was not, at the moment of impact. The data showed that the passenger may have been reclined (Gein: T1437-38, 1461-62). In the five seconds immediately preceding the collision, the driver had accelerated from seventy-eight miles per hour to eighty-two miles per hour and had not applied the brakes (Gein: T1440-48).

Corroborating the event data recorder, forensic evidence from the scene showed that the petitioner had not applied his brakes before the collision (Gein: T1448). Using collision reconstruction techniques, Gein calculated that Sherman Richardson's car was traveling at fifty-three miles per hour when the petitioner struck him, in line, at eighty-two miles per hour. This impact accelerated the speed of Richardson's car to almost seventy miles per hour as it left the roadway. Richardson struck the tree at sixty-six miles per hour (Gein: T1448-55).

10

Meanwhile, Investigator Fontanelli had learned that the SUV was owned by Enterprise Rent-A-Car and had been rented to Giovanni Pisano, who resided in Uniondale. On the same day that Investigator Gein inspected the SUV, December 8, 2014, Fontanelli interviewed Pisano and his wife, Rose Howard. Thereafter, Fontanelli tried to locate a suspect known as "Adam," who he later discovered was Joseph Parks (Fontanelli: T743-50). Fontanelli located and interviewed Parks, who gave Fontanelli a detailed description of the events of December 4 and December 5, 2014. In addition, Parks provided Fontanelli the petitioner's phone number—(347) 553-9950 (Fontanelli: T751-60). On February 3, 2016, Fontanelli interviewed Brittany Johnson, and learned from a review of her phone records that the petitioner had used a second phone number—(917) 539-0672 (Fontanelli: T769-71).

Telephone records and historical cell site location records showing the call activity and locations of the petitioner's and Parks's phones later corroborated the information gained from Parks and other witnesses about the deadly collision and the surrounding circumstances (Fontanelli: T771-72; Sprint Records Custodian RICARDO LEAL: T1011-16; AT&T Custodian of Records DAVID WALKER: T1017-27; T-Mobile Manager of Law Enforcement Relations Group SUSAN JOHNSON: T1028-34; Tracfone Records Custodian WINSTON CHAMBERS: T1250-53; Telefore Owner DARRYL VALINCHUS: T1487-1583).

Sometime in mid-December 2014, the petitioner went to dinner with RAJINDRA RHAMKHARAN, his friend and former employer (Rhamkharan: T583-89). The petitioner was "withdrawn, sad, and not his usual self." Rhamkharan asked what was wrong, and the petitioner answered, "Boss, there was an accident, someone got hurt" (Rhamkharan: T588-91). In January 2015, the petitioner visited Rhamkharan's home and they discussed the incident in more depth. The petitioner told Rhamkharan, "Boss, I was driving and I fell asleep and boom, I hit a car, and

11

he went off the road. I drove away. Someone was chasing me but I lost him." The petitioner also told Rhamkharan that his damaged car was "barbecued" and "burnt." When Rhamkharan told the petitioner that burning the car likely signaled to police that it was the car involved in the collision, the petitioner answered, "I wasn't thinking. I panicked" (Rhamkharan: T591-92).

The petitioner told Rhamkharan that the car was a rental. He said, "They don't know me. They don't know . . . who I am." Rhamkharan disagreed, warning the petitioner that the police would find the person who rented the car and that person "is going to say it was you." The petitioner answered, "No, he doesn't know me. He gave the car to somebody else. He loaned the car to somebody else. He didn't loan it to me." Rhamkharan suggested that "that person is going to tell them that . . . you had the car." But the petitioner was "adamant," insisting, "No, no, they're not going to say anything" (Rhamkharan: T591-93).

Also during this conversation, Rhamkharan asked the petitioner how he knew that somebody had been hurt. The petitioner responded, "It was in the newspaper." Rhamkharan used his phone to read news reports about the "fatal hit and run on the Southern State Parkway." Rhamkharan then advised the petitioner, "This is serious, and your friends, they're not going to take this charge for you. They're going to give you up" (Rhamkharan: T593-94).

Around March 27, 2015, the petitioner and Dubois were in a car together on the Southern State Parkway near Exit 32, where the fatal collision had occurred. The petitioner stated, "You don't think it bothers me? You don't think it fucks with me? You don't think this messes with my conscience?" (Dubois: T1191).

Sometime in late May or early June 2015, Willis encountered the petitioner at Dubois's house. The petitioner was arguing with Dubois. Willis asked the petitioner why he was fighting with Dubois when "she is always going out on a limb, and going out of her way for [you]. She

12

helped [you] cover up when [you] killed somebody." The petitioner's response was that he was "invincible" and that nobody could "touch him" (Willis: T1328).

On July 2, 2015, Dubois was interviewed by an investigator for the New York State Police and an Assistant District Attorney (Dubois: T1188-89, 1191). On July 3, 2015, the petitioner went to Dubois's house and told her that she was "a fucking snitch and that if this, if anything gets back to him, or comes to him, [he was] going to deal with [Dubois]." The petitioner added, "That's what [you] have a fucking lawyer for, Deborah" (Dubois: T1189). On July 16, 2015, the petitioner said something similar, telling Dubois that she "was still running [her] mouth to the police" and that she "was a snitch and that nothing better get back to him" (Dubois: T1189).

In mid-August 2015, the petitioner visited Rhamkharan at his home. The petitioner said, "I'm scared they're going to come get me. I saw [Dubois] talking to an investigator by the house and I think she's going to cooperate and she's going to tell them." Rhamkharan asked the petitioner why Dubois would give the police information about the accident. The petitioner answered, "She helped me burn the car." Rhamkharan asked why the petitioner had involved Dubois knowing that their relationship was "very rocky." The petitioner said, "I know but I'm going to leave. I'm going to leave. I'm going to move to Pennsylvania" (Rhamkharan: T594-95).

The petitioner was arrested in front of Dubois's home on September 22, 2015 (Fontanelli: T769).

<u>The Petitioner's Case</u>

The petitioner presented no evidence on his own behalf.

## The Verdict And Sentence

On March 3, 2017, the jury found the petitioner guilty of all eight counts: manslaughter in the second degree (Penal Law § 125.15); vehicular manslaughter in the second degree (Penal Law

§ 125.12); leaving the scene of an incident without reporting, as a felony (V.T.L. § 600(2)(a)); operating a motor vehicle while under the influence of alcohol (V.T.L. § 1192(3)); operating a motor vehicle while impaired by the combined influence of drugs or of alcohol and any drug or drugs (V.T.L. § 1192(4-a)); aggravated unlicensed operation of a motor vehicle in the third degree (V.T.L. § 511(1)); arson in the third degree (Penal Law § 150.10(1)); and conspiracy in the fourth degree (Penal Law § 105.10(1)) (T1739-43).

On August 11, 2017, the petitioner was sentenced, as a prior felony offender, to an aggregate term of imprisonment of fourteen to thirty years (S62-65).[2] The sentence included the following concurrent terms of imprisonment: an indeterminate term of six to twelve years for his conviction of second-degree manslaughter; an indeterminate term of three to six years for his conviction of second-degree vehicular manslaughter; a definite term of one year for his conviction of driving while intoxicated; a definite term of one year for his conviction of driving while impaired by the combined influence of alcohol and a drug; a definite term of thirty days for his conviction of third-degree aggravated unlicensed operation of a motor vehicle; and an indeterminate term of one and one-half to three years for his conviction of fourth-degree conspiracy. In addition, the sentencing court imposed consecutive indeterminate terms of imprisonment of two to six years for the petitioner's conviction of leaving the scene of an incident without reporting, and six to twelve years for his conviction of third-degree arson (McDonald, J.).

---

[2] Numbers preceded by "S" refer to the sentencing minutes.

14

A R G U M E N T

POINT I

The Petitioner's Procedurally Defaulted Claim Of Legal Insufficiency Is Barred From Habeas Review, But Even If It Were Not, He Would Not Be Entitled To Relief Because The State Court's Adjudication Of The Claim Was Not Objectively Unreasonable (Responding To Ground One Of The Petition).

The petitioner claims that the prosecution "failed to adduce any evidence" that he, rather than his friend Joseph Parks, "was driving on the morning of the fatal accident" (Petition at 4). Thus, according to the petitioner, the prosecution "failed to prove its case beyond a reasonable doubt," and the jury's guilty verdict was "against the weight of the evidence" (*id.*). The second part of this claim, regarding the weight of the evidence, "is not cognizable on habeas review because it is a 'pure state law claim' grounded in N.Y. Crim. Proc. Law § 470.15(5)." *Arevalo v. Artus*, 104 F. Supp. 3d 257, 270 (E.D.N.Y. 2015) (quoting *Correa v. Duncan,* 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001)). Accordingly, this Court is precluded from considering the petitioner's contention that the jury did not weigh the evidence properly in reaching a guilty verdict. *Correa*, 172 F. Supp. 2d at 381 (citing *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)).

However, the first part of the petitioner's claim—namely, his challenge to the legal sufficiency of the evidence—"is based on federal due process principles." *Correa*, 172 F. Supp. 2d at 381. While this part of the claim, therefore, is cognizable, it is barred from habeas review because the Appellate Division held that it was unpreserved for appellate review pursuant to C.P.L. § 470.15(2). Thus, "there were independent and adequate state grounds for the state court's rejection of Petitioner's claim of legal insufficiency." *Medina v. Gonyea*, 111 F. Supp. 3d 225, 233 (E.D.N.Y. 2015). Moreover, the petitioner has failed to show that any exceptional circumstance

15

would warrant federal habeas review of his claim of legal insufficiency, notwithstanding the independent and adequate state grounds for the Appellate Division's rejection of the claim.

But even if the claim were not barred from review, the petitioner would be entitled to no relief because the claim is entirely without merit. In rendering an alternative holding by deciding that "in any event" the evidence of the petitioner's guilt was legally sufficient, the Appellate Division did not issue "a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). In short, the petitioner has failed to demonstrate that the state court applied the clearly established federal standard for legal sufficiency "in a way that was objectively unreasonable." *Dunlap v. Burge*, 583 F.3d 160, 165 (2d Cir. 2009).

A. The Petitioner Has Failed To Make The Exceptional Showing Of Cause And Prejudice That Would Allow Habeas Review Of His Procedurally Defaulted Claim.

At trial, the petitioner failed to argue, as he argues now, that the evidence against him was legally insufficient due to the absence of proof that he was the driver who killed the victim. Indeed, the petitioner failed to move the court for a trial order of dismissal—the vehicle by which such an argument could have been raised—either after the prosecution rested (T1583), or after the defense rested (T1595). *See* C.P.L. § 290.10(1); *see also People v. Hawkins*, 11 N.Y.3d 484, 492 (2008); *People v. Clarke*, 65 A.D.3d 1055, 1055-56 (2d Dept. 2009). Although defense counsel obliquely referred to motions that he might have made in chambers during a charge conference (T1584-95), he made no record of the substance of any such motion nor even stated what form the motion had taken (T1598).

Therefore, when the petitioner raised his claim of legal insufficiency for the first time on direct appeal, the Appellate Division correctly ruled that it was unpreserved for appellate review. *Grant*, 185 A.D.3d at 609 (citing C.P.L. § 470.05(2)). Citing *People v. Contes*, 60 N.Y.2d 620

16

(1983), the court went on to hold that the claim was meritless "[i]n any event." *Grant*, 185 A.D.3d at 609. Upon "viewing the evidence in the light most favorable to the prosecution," the Appellate Division found that "it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Id.* (citing *Contes*, 60 N.Y.2d at 621). In *Contes*, the New York Court of Appeals stated: "The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Contes*, 60 N.Y.2d at 621 (quoting *Jackson v Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

Under New York law, before an appellate court may review a claim as a matter of law, that claim must first be raised at the appropriate time at the trial level. This is known in federal courts as the "contemporaneous objection rule." *Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011). The rule, codified at section 470.05 of the New York Criminal Procedure Law, "is a firmly established and regularly followed New York procedural rule." *Downs*, 657 F.3d at 104. "This requirement allows the trial court 'an opportunity to correct any error in the proceedings below at a time when the issue can be dealt with most effectively.'" *People v. Delorbe*, 35 N.Y.3d 112, 119 (2020) (quoting *People v. Lopez,* 71 N.Y.2d 662, 665 (1988)). In addition, the contemporaneous objection rule "preserves limited judicial resources and avoids untoward delay in the resolution of criminal proceedings." *Delorbe*, 35 N.Y.3d at 119 (internal citations omitted). "Lastly, it protects 'the very real interest of the State in achieving finality in a criminal prosecution.'" *Id.* (quoting *Lopez,* 71 N.Y.2d at 665).

The contemporaneous objection rule, relied upon by the state appellate court in this case, "constitutes an independent and adequate state law ground for disposing of a claim" raised in a federal habeas corpus action. *Downs*, 657 F.3d at 104*; see also Garvey v. Duncan*, 485 F.3d 709,

720 (2d Cir. 2007) ("[T]he procedural bar of § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding."). "Federal courts generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey*, 485 F.3d at 713 (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). That is so even if—as in this case—the Appellate Division evaluates the merits of an unpreserved contention in an alternative holding. "It is well settled that where a state court decision states that a claim is procedurally barred, and then rules 'in any event' on the merits, the claim is procedurally barred." *Rattray v. Brown*, 261 F. Supp. 2d 149, 156 (E.D.N.Y. 2003) (citing *Harris v. Reed,* 489 U.S. 255, 264 n.10 (1989); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)).

Accordingly, this Court should not review the petitioner's claim of legal insufficiency. Federal review of such a defaulted claim is permissible "[o]nly upon the exceptional showing of 'cause and prejudice' for the state delinquency." *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir. 2001).[3] The "principles of comity, finality, and federalism" require such an exceptional showing in order "to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). This requirement "concerns the respect that federal courts owe the States and the States' procedural rules when reviewing the

---

[3] There are two other circumstances, in addition to a petitioner's showing of "cause and prejudice," in which "[a] federal habeas petitioner may seek review of his federal claims notwithstanding the existence of independent and adequate state law grounds for the state courts' decision . . . . First, he may do so if he is actually innocent of the crime for which he has been convicted. Second, he may also do so if the state law, while generally adequate, has been applied exorbitantly." *Medina*, 111 F. Supp. 3d at 233 (citations omitted). Neither exception is applicable here. A petitioner may establish his "actual innocence" for the purpose of overcoming independent and adequate state law grounds by showing that in the light of new evidence "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Here, the petitioner has presented no new evidence or otherwise made any attempt to establish his "actual innocence." Nor has he alleged that C.P.L. § 470.05(2) was applied exorbitantly in this case.

18

claims of state prisoners in federal habeas corpus." *Coleman v. Thompson,* 501 U.S. 722, 726 (1991). In keeping with these principles, the Second Circuit has "recognized the sovereignty of state tribunals, and refused to consider a state prisoner's defaulted habeas claim absent a sufficient justification for the noncompliance." *Carmona*, 243 F.3d at 633.

Here, the petitioner has failed to make an exceptional showing of cause and prejudice. Indeed, he makes no attempt to show any cause for his default or any resulting prejudice from the default. Nor could he do so. At the petitioner's trial, defense counsel made no argument that the evidence was legally insufficient because such an argument would have been frivolous. There was ample evidence—including several admissions from the petitioner himself—that he was the driver of the SUV that killed the victim. Hence, the petitioner's claim of legal insufficiency is barred from this Court's review.

B.     It Was Not Objectively Unreasonable For The Appellate Division To Conclude That A Rational Juror, After Viewing The Evidence In The Light Most Favorable To The Prosecution, Could Have Found That The Petitioner Was The Driver Responsible For The Victim's Death.

Even if the petitioner's claim of legal insufficiency were not barred from review, he would be entitled to no relief from this Court because the claim is without merit. The petitioner cannot meet his burden of establishing that the Appellate Division's adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 409-15 (2000). An "'unreasonable application of'" such precedent "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "Rather, '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood

19

and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

In reviewing the legal sufficiency of the evidence, "the critical inquiry . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). This is to say that the rejection of the petitioner's sufficiency challenge by the state courts may not be overturned in this federal habeas corpus proceeding absent a determination that "no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

The *Jackson* standard for legal sufficiency is "deferential." *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989). It is even more so when applied in the context of a federal habeas petition by a state prisoner. Indeed, in such a context it becomes a "twice deferential standard" (*Parker v. Matthews*, 567 U.S. 37, 43 (2012)), which presents "a high bar" to relief (*Coleman v. Johnson*, 566 U.S. 650, 651 (2012)). Thus, "[a] habeas petitioner challenging his conviction on the ground that it was not supported by sufficient evidence 'bears a very heavy burden.'" *Taylor v. Connelly*, 18 F. Supp. 3d 242, 266 (E.D.N.Y. 2014) (quoting *Einaugler v. Supreme Court of the State of N.Y.,* 109 F.3d 836, 840 (2d Cir. 1997)).

Accordingly, to prevail in this case the petitioner must meet the very heavy burden of establishing that the Appellate Division was *objectively unreasonable* in deciding that a rational juror, after reviewing the evidence in the light most favorable to the prosecution, could have found that the petitioner was the driver of the SUV that killed Sherman Richardson. The petitioner has not come close to making such a showing.

20

The petitioner premises his claim on a patent falsehood. He asserts that Joseph Parks, while testifying at trial, admitted that he was "probably" the driver who caused the fatal collision (Petition at 4-5). In fact, Parks unambiguously and consistently testified that he was a passenger in the SUV that the petitioner was driving. The petitioner's assertion depends upon a mischaracterization of Parks's testimony. During cross-examination, counsel referred Parks to the transcript of his videotaped interview on June 30, 2015 (T1121). Reading from it, counsel inquired:

MR. ROLLOCK:      You were asked, which side of the vehicle did you get in when leaving Starlet's? You said the front driver's seat then quickly you corrected yourself and you said the passenger's seat; isn't that right?

PARKS:      The passenger's seat, right.

MR. ROLLOCK:      First you said the driver's seat, then you quickly changed your answer and said the passenger's seat?

PARKS:      Made a mistake.

MR. ROLLOCK:      But that did happen, right?

PARKS:      Excuse me.

MR. ROLLOCK:      That did happened [sic], you *said* driver's seat?

PARKS:      I don't know if it happened. You have the paper there. You're *reading from it*. Maybe. Probably did, yes.

MR. ROLLOCK:      Right. So, so, you start to say, driver's seat then quickly said passenger's seat, right? That happened on video, right?

PARKS:      I have no idea. I just told you I don't know.

(T1121-22) (emphasis added). Thus, the record shows that Parks, responding to a question about his previously recorded statement, acknowledged only that he "probably did" say the words. But the petitioner mischaracterizes the testimony when he contends that Parks admitted he was "probably" the driver. During this exchange counsel did not ask whether Parks was the driver, and Parks did not answer that he "probably" was the driver.

21

In the petitioner's brief to the Appellate Division, he cited pages 984 and 1462 of the trial transcript to support his contention that Parks "admitted, under cross-examination, that he was not wearing his seatbelt at the time of the crash . . . while the vehicle's black box showed that only one occupant—the driver, Parks—was unbuckled" (Appellant's Brief at 22). But the record shows that the testimony was more ambiguous. On cross-examination, counsel asked:

> MR. ROLLOCK:   You didn't see that [the petitioner] had his seatbelt on, correct?
>
> PARKS:   I don't know if he got a seatbelt on.
>
> MR. ROLLOCK:   You weren't wearing your seatbelt, right?
>
> PARKS:   No.

(T984). It is unclear whether Parks's "no" indicated that he disagreed with his questioner—*i.e.*, "No, that is not right; I was wearing my seatbelt."—or agreed with him—*i.e.*, "No, I was not wearing my seatbelt." Counsel did not ask follow-up questions, and the witness's inflection and expression, which informed the jurors, were not recorded. But even if Parks mistakenly recalled that he was not wearing a seatbelt, that inconsistency stands isolated in more than three hundred pages of his own testimony and thousands more pages of additional testimony and evidence. One possibly incorrect memory hardly suggested that a dozen or more people, including many of the petitioner's closest associates, embarked on a months-long coordinated conspiracy to falsely accuse him of crimes that Parks, a person unknown to them, had actually committed. Certainly, had that happened, the petitioner could have identified more than a single inconsistency in a trial record that was over 1,800 pages long.

Throughout a lengthy and detailed direct examination, and during a cross-examination that was rigorous and confrontational, Parks was adamant that the petitioner was driving the SUV when the fatal collision occurred (Parks: T867-80, 983-84, 1101, 1107-09, 1124, 1139). The testimony

22

of every other witness, and all the physical and circumstantial evidence, corroborated Parks uncontroverted testimony. The conduct of the petitioner and all those around him in the aftermath of the fatal collision made sense only if the petitioner had been the driver. Had Parks been the driver, it would have made no sense.

For instance, four witnesses testified that the petitioner separately admitted to each of them that he was guilty (Rhamkharan: T583-95; Johnson: T655-63, 707, 722; Dubois: T1169-70, 1183-84, 1224-25, 1189, 1191; Willis: T1326-28). The witnesses were close associates of the petitioner, and none had met Parks before the incident (Rhamkharan: T583-88; Johnson: T628-30; Dubois: T1160-63, 1165; Milner: T1261-62, 1280-81; Willis: T1308-10, 1322). Those witnesses recited details about the crime that they would have known only if the petitioner had recounted them (Rhamkharan: T591-95; Johnson: T662; Dubois: T1169-70; Willis: T1308-10).

Immediately after the fatal collision, Shand pursued the SUV as it navigated back streets that were familiar to the petitioner but not to Parks (Shand: T505-09; Parks: T878-80; Dubois: T1162-63). Phone records showed that Parks managed to place a phone call at 6:31 a.m., just as the SUV was rapidly fleeing the scene, while the petitioner's phone was silent during this period (Valinchus: T1519-22). The petitioner retreated to the home of Deborah Dubios, the mother of his children (Parks: T880-83, 1190; Dubois: 1164-66). The petitioner enlisted the help of his associates, not Parks's, in his conspiracy to torch the SUV as it sat parked in front of Dubois's house (Parks: T899-911; Dubois: T1176-1186; Milner: T1266-89; Willis: T1314-26). The petitioner, not Parks, paid Shamel Milner to burn the car (Parks: T908-11; Dubois: T1176-77; Milner: T1266-82, 1291).

As the foregoing testimony demonstrates, the petitioner cannot establish that the Appellate Division was objectively unreasonable in deciding that the evidence, when viewed in the light

23

most favorable to the prosecution, was such that a rational trier of fact could have concluded that the petitioner, as the driver of the SUV that killed the victim, was guilty of the crimes charged. It simply cannot be said that the court's adjudication of the petitioner's legal insufficiency claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woodall*, 572 U.S. at 420. Because there was no such glaring error here, the petitioner's claim would be unavailing even if it were not barred from this Court's review.

## POINT II

The Petitioner's Claim That His Historical Cell Site Location Records Were Seized In Violation Of His Fourth Amendment Rights Is Barred From Habeas Review And, In Any Event, Is Meritless (Responding To Ground Two Of The Petition).

The petitioner claims that his Fourth Amendment rights under *Carpenter v. United States*, __ U.S. __, 138 S. Ct. 2206 (2018), were violated when his historical cell site location records were obtained without a valid search warrant (Petition at 6). The petitioner's claim cannot be reviewed in this federal habeas corpus proceeding. In any event, because the claim elevates form over substance, it is without merit. The court's order authorizing the acquisition of the records was not labelled a "warrant," but the order "made an express finding of probable cause, which was supported by the People's evidentiary showing." *Grant*, 185 A.D.3d at 609. For this reason, the Appellate Division rightly concluded that "the order was effectively a warrant which complied with the requirement of *Carpenter*." *Grant*, 185 A.D.3d at 609 (citations and quotation marks omitted).

### A. The Petitioner Had An Opportunity For Full And Fair Litigation Of His Fourth Amendment Claim In State Court.

A federal court may not grant habeas corpus relief on a Fourth Amendment claim where the petitioner was afforded "an opportunity for full and fair litigation" of the claim in state court.

24

*Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also Kuhlmann v. Wilson*, 477 U.S. 436, 446-47 (1986); *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991);  *Pina v. Kuhlmann,* 239 F. Supp. 2d 285, 289 (E.D.N.Y. 2003). "Federal courts have approved New York's procedures for litigating Fourth Amendment claims embodied in N.Y. Crim. Proc. Law §§ 710(10) *et seq.* (McKinney 1995), as being facially adequate."  *Walker v. Walker*, 259 F. Supp. 2d 221, 225 (E.D.N.Y. 2003); *see also Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977). Thus, the petitioner's claim is barred absent a showing that he was denied the opportunity to avail himself of these procedures. The petitioner has not claimed that he lacked such an opportunity, and the record reflects that he did not.

Before and during his trial, the petitioner did not argue that his cell site records were seized in violation of his Fourth Amendment rights. But that is not because he lacked the opportunity to make such an argument. He could have raised his claim in a pretrial suppression hearing or by motion to the trial court. When the petitioner raised the claim for the first time on appeal, the Appellate Division evaluated its merits in an alternative ruling, after noting that the claim was unpreserved. *Grant*, 185 A.D.3d at 609. Accordingly, "[the petitioner] had his day in the New York courts on this issue.  He is not entitled to another here." *Thiam v. Artuz*, 98 Civ. 6708 (MBM), 2000 WL 1056323, at *7 (S.D.N.Y. Aug. 1, 2000).

B.   <u>The Claim Was Rejected On Independent And Adequate State Procedural Grounds.</u>

The petitioner's claim is also unreviewable because it was rejected on independent and adequate state procedural grounds. Before ruling on the merits of the petitioner's claim, the Appellate Division determined that the claim was "unpreserved for appellate review." *Id.* (citing C.P.L. § 470.05(2)). The court's application of the preservation rule was not unfair, even though the petitioner's trial, which took place in February 2017, predated *Carpenter*, decided in 2018.

25

That is so because, years before *Carpenter*, there was substantial decisional law, which should have been known to the petitioner's trial counsel, on the issue of whether a search warrant was required for the acquisition of cell site location records. *See, e.g., People v. Sorrentino*, 93 A.D.3d 450, 451 (1st Dept. 2012) (holding that cell site order obtained under 18 U.S.C. § 2703(d), which was supported by "the court's finding of probable cause," was "effectively a warrant"). Indeed, in an opinion published in 2014, a magistrate judge in the Southern District of New York noted that "the decisions in this District and the Eastern District of New York are split as to whether police need a search warrant for cell site location information." *Cucuta v. New York City*, 25 F. Supp. 3d 400, 416 n.21 (S.D.N.Y. 2014) (Peck, M.J.) (citations omitted). Hence, trial counsel knew, or should have known, that the apparent absence of a search warrant in a case such as this one was a potential issue to be raised on behalf of the accused—both at trial and on direct appeal. *See People v. Scott*, 126 A.D.3d 645 (1st Dept. 2015) (holding that a change in the law which occurred after defendant's trial did not excuse his failure to preserve issue for appeal).

Of course, trial counsel's failure to raise a Fourth Amendment claim with respect to the cell site records had nothing to do with the timing of the *Carpenter* decision. Counsel did not raise such a claim for the simple reason that the claim would have had no merit. Because the order authorizing the acquisition of the cell site records was expressly premised on a probable cause finding, counsel had no grounds to move prior to trial to suppress the records as the product of an illegal search. Nor did he have any basis to object during the trial to the admission of the records. It is, therefore, unsurprising that defense counsel did not raise the claim.

The petitioner's failure to preserve the claim for appellate review pursuant to C.P.L. § 470.05(2) constitutes independent and adequate state law grounds for the Appellate Division's rejection of the claim. *Downs*, 657 F.3d at 104. Absent exceptional circumstances, therefore, the

26

petitioner's claim is barred from habeas review. He may obtain this Court's review of the claim, notwithstanding this independent and adequate state grounds, only if he is able to make a showing of cause and prejudice with respect to his default. *Carmona*, 243 F.3d at 633. The petitioner has not attempted to make such a showing. Nor could he make one if he tried. The cause of the petitioner's default was his counsel's sensible decision not to raise a pointless claim without any legal merit. The petitioner has not been prejudiced in any way by his failure to obtain review of this meritless claim. Accordingly, this Court should decline to review the petitioner's Fourth Amendment claim.

      C. In Any Event, The Claim Is Without Merit Because The Cell Site Records Were Acquired Only After A Judicial Finding Of Probable Cause.

Even if the petitioner's Fourth Amendment claim were not barred from review, he would be entitled to no relief from this Court because the claim is without merit. The petitioner cannot meet his burden of establishing that the Appellate Division's adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, *Carpenter* or any other Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

In *Carpenter*, the United States Supreme Court held that the government's acquisition of historical cell site location information constitutes a search for Fourth Amendment purposes, and therefore "the Government must generally obtain a warrant supported by probable cause before acquiring such records." 138 S. Ct. at 2221. Because an application pursuant to 18 U.S.C. 2703(d) of the Stored Communications Act employs a lesser "reasonable grounds" standard, requiring only that the cell site evidence is "relevant and material to an ongoing investigation," the Court decided that such an application is "not a permissible mechanism for accessing historic cell site records." 138 S. Ct. at 2221. Nothing in the Court's opinion suggests, however, that it is the mere form of the application, rather than the standard of proof upon which it is based, that determines whether

27

a defendant's Fourth Amendment rights have been satisfied. Indeed, it follows logically from the *Carpenter* opinion that any application supported by probable cause would be satisfactory, even if it were not denominated an application for a warrant.

As the Court in *Carpenter* noted, the "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Id.* at 2213 (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528(1967)). The protection against such invasions is the probable cause standard. *Carpenter*, 138 S. Ct. at 2213. Without probable cause, a search is unreasonable unless it falls within an exception. *Id.* at 2221. But there is no "unreasonable" search authorized by a valid judicial finding of probable cause. Where probable cause is properly found, there is no arbitrary invasion. That is the point of requiring probable cause. *See generally Brinegar v. United States*, 338 U.S. 160, 176 (1949) (noting that the "long-prevailing" probable cause standard "seek[s] to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime").

In this case, there was nothing lacking in the probable cause finding on which the order authorizing the acquisition of the petitioner's phone records was based. Indeed, the finding was not challenged in the trial court, and the petitioner does not challenge the finding in this proceeding. The applications on which the court relied in issuing the order described in detail the police investigation that led to the discovery of the SUV involved in the fatal hit-and-run; from there, the applications described, in step-by-step fashion, how police located Joseph Parks and obtained from him a full account of the events that transpired on December 4 and 5, 2014. Included in Parks's statement and statements from the petitioner's three other co-conspirators were allegations establishing the petitioner as the intoxicated driver who killed another motorist and orchestrated a

28

conspiracy to destroy the evidence of his guilt. The witnesses gave police the petitioner's phone numbers and described how he used his phones in furtherance of his crimes. The prosecutor, therefore, affirmed that the applications contained "specific and articulable facts showing reasonable grounds, indeed probable cause, to believe that [cell site records were] relevant and material to [the] ongoing investigation." The prosecutor further affirmed that "the application before [the court] has established probable cause to obtain the requested historical cell site and location information connected to [the petitioner's telephone] for the time period of December 4, 2014 up to and including December 6, 2014." Those affirmations have never been contested.

Accordingly, there was nothing objectively unreasonable in the Appellate Division's conclusion that the cell site order was based upon "an express finding of probable cause . . . supported by the People's evidentiary showing" and, therefore, "was effectively a warrant which complied with the requirement of *Carpenter*." *Grant*, 185 A.D.3d at 609. *Carpenter* requires the State to make a showing of probable cause before acquiring historical cell site location records. It is indisputable that such a showing was made to the satisfaction of the court with jurisdiction over this case. No evidence was obtained here in the absence of a judicial finding of probable cause.

But even if there had not been the requisite showing of probable cause, there would be no merit to the petitioner's Fourth Amendment claim. According to *Davis v. United States*, 564 U.S. 229 (2011), and other authorities, law enforcement acted in "good faith" in relying on 18 U.S.C. § 2703(d) to acquire the petitioner's cell site location information. Moreover, even if the seizure of the phone records were somehow unlawful, *Carpenter* did not require the reversal of the petitioner's judgment of conviction because the evidence of his guilt was overwhelming and any error in the admission of the records was harmless.

29

The "sole purpose" of the exclusionary rule is to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37. Therefore, where an unlawful search is "conducted in objectively reasonable reliance on binding appellate precedent," the evidence obtained through the search should not be excluded because "suppression would do nothing to deter police misconduct." *Id.* at 232. This is the "'good faith' exception" to the exclusionary rule. *Id.* at 238. Likewise, "[r]eliance on a federal statute gives rise to a presumption of good faith unless the statute is 'clearly unconstitutional.'" *United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021) (quoting *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987)). Here, the cell site records were obtained by an order issued pursuant to 18 U.S.C. § 2703(d) of the Stored Communications Act—a statute which was not "clearly unconstitutional" in the relevant period of 2014 to 2016. Both law enforcement and the court strictly adhered to the requirements of the statute, and the petitioner has not alleged otherwise. Because the petitioner's phone records were plainly obtained in good faith, notwithstanding the Supreme Court's holding in *Carpenter*, there was no basis in federal law for suppressing the records.

Although no error occurred with respect to the cell site records in this case, any error would have been harmless in view of the overwhelming evidence of the petitioner's guilt. The records only corroborated uncontroverted testimony and other evidence proving that the petitioner and Joseph Parks were traveling together at certain times and in certain locations. The records did not establish whether the petitioner or Parks drove the SUV, which was the only issue that the petitioner contested at trial (T1598-1615). Because the petitioner's guilt was overwhelmingly established through the testimony of the many eyewitnesses to the crime and its aftermath, most of whom were his associates, the exclusion of the records from the trial evidence would not have changed the verdict, and, therefore, their admission was harmless. *See United States v. Mikhel*,

30

889 F.3d 1003, 1019 n.1 (9th Cir. 2018) (noting that the *Carpenter* "decision will have no impact on this case because the cellphone data only corroborated other evidence" and guilt was so overwhelming that "the exclusion of the evidence would not have changed the verdicts"); *see also United States v. Benbow*, 709 Fed. Appx. 25, 26-27 (U.S. Dist. Ct. D.C. 2018) (same).

In sum, the petitioner's Fourth Amendment claim is barred from habeas review due to his failure to preserve the claim for review by the state appellate courts pursuant to C.P.L § 470.05(2). In any event, the Appellate Division's adjudication of the claim on its merits did not result in a decision that was contrary to, or involved an unreasonable application of, *Carpenter* or any other Supreme Court precedent. The order authorizing access to the petitioner's cell site location records was based upon a valid judicial finding of probable cause, which is exactly what *Carpenter* requires. Moreover, in seizing the records, law enforcement acted in good faith reliance on 18 U.S.C. § 2703(d), which at the time had yet to be ruled unconstitutional by *Carpenter*. Accordingly, there is no basis for granting the relief that the petitioner now seeks.

<u>POINT III</u>

The Petitioner's Attack On The Grand Jury Proceeding Is Baseless And Does Not Present A Federal Question Cognizable On Habeas Corpus Review (Responding To Ground Three Of The Petition).

The petitioner claims that the grand jury conducted an improper revote on the charges against him and his co-conspirators (Petition at 7). The claim has no basis in the record. As to the charges against the petitioner, the grand jury voted only once, on September 15, 2015, to return a true bill against him. On September 18, 2015, the prosecution filed the first and only indictment against the petitioner. The grand jury was not asked to revote any charges against the petitioner, and the original indictment was not superseded. Nevertheless, the petitioner now reprises his claim

31

on direct appeal (Appellant's Brief at 33-41) that the grand jury's legally authorized second vote

on the charges against three other targets of the investigation (Deborah Dubois, Tamara Willis,

and Shamel Milner), who in a separate indictment were charged jointly with one another, but not

with the petitioner, was improper and prejudicial *to him*. The Appellate Division agreed with the

District Attorney's assessment of this claim (Respondent's Brief at 41-46), ruling that it was

"without merit" (*Grant*, 185 A.D.3d at 610). The claim has no more merit now than when it was

first raised, and it does not present a federal question cognizable on habeas corpus review.

"Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas

corpus proceeding in federal court." *Davis v. Mantello*, 42 Fed. Appx. 488, 490 (2d Cir. 2002)

(summary order) (citing *Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir.1989)); *see also Davis v. Nassau*

*County*, 524F. Supp. 2d 182, 192 n.4 (E.D.N.Y. 2007) ("[A]lleged defects in a state grand jury

proceedingcannot provide grounds for habeas relief."). Hence, even if the petitioner's claim had

merit, which it does not, the claim would provide no basis for relief from this Court.[4]


## POINT IV

The Petitioner's Complaints About His Sentence Are Partially Moot And Do Not Present
A Federal Question Cognizable On Habeas Corpus Review (Responding To Grounds Four
Through Six Of The Petition).

Under "Ground Four," the petitioner contends that the sentencing court improperly ordered

him to pay the mandatory surcharge by civil judgment (Petition at 8). The petitioner made the same

---

[4] In his brief to the Appellate Division, the petitioner argued that his claim would be cognizable on federal
habeas corpus review because the defects in the grand jury proceeding were so serious that the trial court "was divested
of jurisdiction" over his case (Appellant's Brief at 34 n.8). But even if it were true that the allegedly improper revote
by the grand jury rendered the resulting indictment jurisdictionally defective, that indictment charged the petitioner's
co-conspirators, not the petitioner. There was never a revote by the grand jury on the separate indictment charging the
petitioner. Thus, even according to the petitioner's own argument, his grand jury claim is not cognizable in this habeas
corpus proceeding.

complaint on direct appeal (Brief for Appellant at 42-46). The Appellate Division agreed with him, modifying his judgment of conviction "by vacating the provision thereof directing payment of the mandatory surcharge by civil judgment and substituting therefore a provision directing payment of the mandatory surcharge pursuant to Penal Law § 60.35(5)." *Grant*, 185 A.D.3d at 608. The petitioner's current contention, therefore, is moot. Moreover, it does not present a federal question cognizable on habeas corpus review.

Similarly, under "Ground Five," the petitioner complains, just as he did on direct appeal (Brief for Appellant at 47-53), that his three consecutive sentences were "unduly harsh and excessive" (Petition at 9). This second claim regarding the petitioner's sentence does not present a federal question cognizable on habeas corpus review.

Finally, under "Ground Six," the petitioner argues that the sentencing court's "restitutionary award of $39,374.75 was improper" (Petition at 10). This argument, like his contention about the payment of the mandatory surcharge, was raised on direct appeal (Brief for Appellant at 54-60), and it was found to be meritorious by the Appellate Division, which modified the petitioner's judgment of conviction by vacating the offending provision and substituting for it one "directing the defendant to make restitution to the Crime Victims Board for the family of Sherman Richardson in the sum of $15,000 and to Enterprise Rent-A-Car in the sum of $3,374.75." *Grant*, 185 A.D.3d at 608. Accordingly, this third claim concerning the petitioner's sentence is, like the first, moot, and it, also, is not cognizable on federal habeas corpus review.

The petitioner's challenges to the fines and restitution imposed by the sentencing court merely concern state laws—namely, Penal Law §§ 60.27(5)(a) and 60.35(5)—not federal constitutional or statutory questions. "The payment of restitution or a fine . . . is not the sort of 'significant restraint on liberty' contemplated in the 'custody' requirement of the federal habeas

33

corpus statutes." *Obado v. New Jersey*, 328 F.3d 716, 718 (3d Cir. 2003); *see also Bailey v. Hill* 599 F.3d 976, 982 (9th Cir. 2010) ("We . . . conclude that § 2254(a) does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence."); *Washington v. Smith*, 564 F.3d 1350, 1351 (7th Cir. 2009) (noting that a habeas petition "is unavailable to challenge a restitution order imposed as part of a criminal sentence"). As such, these challenges are not cognizable on federal habeas corpus review.

Likewise, the petitioner's complaint that the consecutive terms of imprisonment to which he was sentenced were "unduly harsh and excessive" (Petition 9) is not reviewable in a federal habeas corpus proceeding. "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). In fact, the petitioner received less than the statutory maximum for his crimes (S60-65). Although the sentencing court ordered that the prison terms were to run consecutively, that discretionary ruling was authorized by state law, and justified by the facts of the case. *See* Penal Law § 70.25(2). Because the petitioner's sentence was not "illegally imposed, in excess of the applicable statutory maximum, based upon materially incorrect information, or the result of a constitutionally defective sentencing procedure" (*United States v. Gaggi*, 811 F.2d 47, 62 (2d Cir. 1987)), this Court should not interfere with the sentencing court's exercise of discretion.

The Supreme Court has emphasized that "a judge . . . is to be accorded very wide discretion in determining an appropriate sentence. The sentencing court . . . must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Wasman v. United States*, 468 U.S. 559, 563 (1984). While petitioner's aggregate sentence is lengthy, it is fully justified by the circumstances of this case, as the court explained before imposing sentence (S59-60). The petitioner's crimes caused the victim's

34

family to experience a devastating and profound loss, for which the petitioner has expressed little or no genuine remorse. To the contrary, he has continually deflected blame for the incident towards other people. Now, the petitioner complains once again about the penal consequences of his actions, but he offers no good reason for this Court to meddle with the exercise of the sentencing court's discretion.

This Court should reject the petitioner's sentencing claims because they are partially moot, and none presents a cognizable federal issue. In any event, the petitioner's sentence was entirely justified.

<u>CONCLUSION</u>

<u>The Petition For A Writ of Habeas Corpus Should Be Denied.</u>

Dated:    Mineola, New York
          December 29, 2021

                              Respectfully submitted,

                              Joyce A. Smith
                              Acting District Attorney, Nassau County
                              *Attorney for Respondent*
                              262 Old Country Road
                              Mineola, New York 11501
                              (516) 571-3660

                    By:      /s/ Jason R. Richards
                             JASON R. RICHARDS

Yael V. Levy
Jason R. Richards
  Assistant District Attorneys
    *of Counsel*

35

**Certificate of Service**

I hereby certify that, on December 29, 2021, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon:

Madi Grant, DIN 17-A-4749
*Petitioner Pro Se*
Great Meadow Correctional Facility
P.O. Box 51
Comstock, New York  12821-0051

Joyce A. Smith
Acting District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3660

By:      /s/ Jason R. Richards
JASON R. RICHARDS